## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

BRYAN GIORDANO et al.,      :
                                :
        Plaintiffs,      :
                                :
v.                            :        No. 3:07cv1444 (MRK)
                                :
CONNECTICUT VALLEY      :
HOSPITAL et al.         :
                                :
        Defendants.     :

## <u>MEMORANDUM OF DECISION</u>

In late September 2007, Plaintiffs – nine long-term residents of Connecticut Valley Hospital

("CVH"), a state-operated psychiatric facility – sued CVH, Thomas A. Kirk, Jr., the Commissioner

of the Connecticut Department of Mental Health and Addiction Services ("DMHAS"), and Luis B.

Perez, the Chief Executive Officer of CVH, seeking to enjoin them from implementing a complete

ban against smoking and tobacco products scheduled to take effect on the CVH campus on October

1, 2007.[1]   Plaintiffs, then proceeding *pro se*, alleged that the proposed smoking ban violated a

number of their federal and state constitutional and statutory rights. *See* Compl. [doc. # 1]. In

response, Defendants obviated the need for a preliminary injunction hearing by graciously agreeing

to a moratorium on the proposed smoking ban pending a resolution of this action. *See* Moratorium

on Tobacco Free Policy, Pls.' Mem. in Supp. of Pls.' Objection to Defs.' Mot. for Summ. J.

[hereinafter Pls.' Objection] [doc. # 102-2] Ex. M; Order [doc. # 36] (denying Plaintiffs' Motion for

Preliminary Injunction [doc. # 4] based on Defendants' representations that the proposed smoking

---

[1] Plaintiffs also sought to enjoin a CVH ban on travel as violative of their First Amendment rights.
*See* Second Am. Compl. [doc. # 92] at 2, 11-12. The parties agreed to proceed with discovery and
briefing on the smoking ban portion of this case separately from the travel ban aspect of Plaintiff's
challenge. This decision pertains only to the constitutionality of the smoking ban; the travel ban
portion of the case is subject to a different scheduling order and remains in discovery.

ban was temporarily suspended as a result of this Court's proceedings).

The Court appointed counsel to represent Plaintiffs, and after considerable motion practice, allowed Plaintiffs a final opportunity to amend their complaint. *See* Order [doc. # 89]. Plaintiffs did so, and following a period of discovery, Defendants filed a Motion for Summary Judgment [doc. # 95], which is presently before the Court. The Court held oral argument to clarify and address the parties' respective positions regarding the constitutionality of the proposed smoking ban. A large number of Plaintiffs attended that argument. They feel strongly about their claims and have pursued them in a dignified, courteous, and effective manner. In the process, they have earned the Court's respect. The Court is similarly grateful to Plaintiffs' appointed counsel, as well as counsel for Defendants and *amicus*, the Connecticut Legal Rights Project, for their work on this case.

Though the principal matter before the Court is the constitutionality of the proposed smoking ban, this case also raises important issues concerning, among others, mental health treatment, nicotine addiction, personal autonomy and dignity, institutional authority, and respectful decisionmaking. For Plaintiffs – all long-term residents of CVH for whom the CVH campus literally is "home" – the smoking ban represents a forced curtailment of one of the few pleasures they enjoy in that institutional setting and, say Plaintiffs, is an affront to their dignity and autonomy; the ban also has the potential to adversely affect their medication. For Defendants, the smoking ban responds to important health concerns for both the patients at CVH as well as its employees, who are exposed to second-hand smoke and the health dangers that necessarily arise from that exposure; the ban also represents an important statement of responsible health-care principles by the State against behavior that is well known to have particularly deleterious health effects among mental health patients.

Needless to say, balancing these important interests is by no means easy. The Court does not discount the difficulty of that task. But, as became evident during oral argument, it seems clear that CVH adopted the facility-wide smoking ban without any meaningful resident involvement in the decisionmaking or manner of implementation and without proper preparation. Yet, the wisdom of the way in which CVH's administrators adopted the smoking ban is not the issue for the Court. Instead, the question before the Court is whether a complete ban against smoking and tobacco products at CVH violates a federal constitutional right. After careful thought and consideration, the Court concludes that it does not. Perhaps, however, CVH's administrators will have learned from the lessons of this lawsuit and will, if they choose to do so, lift the voluntary moratorium in a responsible way that respects the concerns and dignity of Plaintiffs.

## I.

The facts are relatively straight-forward and largely uncontested. CVH is a state-operated psychiatric facility that provides inpatient psychiatric and addiction services to its residents. It is comprised of various buildings located throughout an approximately 100-acre campus located in Middletown, CT. CVH has three divisions: the Whiting Forensic Division, which offers specialized services to individuals involved in the criminal justice system and to those who are civilly committed and require a more secure setting; the General Psychiatry Division, which cares for the majority of CVH residents; and the Addiction Services Division. Plaintiffs are all residents of CVH,[2] and the facility has been their home from between two and twenty-four years. Plaintiffs each smoke and

---

[2] Plaintiffs Giordano, Dyous, Palletolo, Nash, and Johnston are military veterans and acquittees (individuals found not guilty by reason of mental disease or defect pursuant to Conn. Gen. Stat. § 53a-13), who are under the authority of the State's Psychiatric Security Review Board. Plaintiff Copeland is a civilly committed resident of CVH. Plaintiffs Elliott, Schibi, and Torok are residents of CVH. *See* Second Am. Compl. [doc. # 92] at 2-4.

have for years.  *See* Second Am. Compl. [doc. # 92] at 2-4; Aff. of Bryan Giordano, Pls.' Objection [doc. # 102-2] Ex. H at 3, ¶ 15 ("I have been smoking for more than 39-years.").  Therefore, Plaintiffs are all subject to CVH's smoking ban.

Although the decision to transform CVH into a smoke-free campus had been considered by officials of DHMAS and CVH for quite some time, the initiative gained particular force in 2007 under Mr. Perez.  For example, as early as September 2006, DHMAS Deputy Commissioner Peter Rockholz and Mr. Perez discussed the possibility of implementing a smoking ban at CVH.  In addition, Mr. Perez had discussions with Commissioner Kirk about implementing a smoke-free policy at CVH.  Apparently at Commissioner Kirk's suggestion, Mr. Perez attended a May 2007 meeting in Washington, D.C. sponsored by the National Association of State Mental Health Program Directors ("NASMHPD").  The conference addressed best practices for implementing smoking cessation policies in psychiatric hospitals.  At that meeting, Mr. Perez participated in the development of a NASMHPD "Best Practices Toolkit" that advocated for "tobacco-free systems of care" that would "reduce the toll of smoking on people with mental illness."  *See* Aff. of Luis B. Perez [doc. # 95-2] at 2, ¶ 7.  Further, as early as 2006 and again in April 2007, the employees' union at CVH stated its desire to move to a smoke-free work environment and that its members no longer wanted to act as escorts to residents during their scheduled outdoor smoke breaks so as to minimize the health risks associated with exposure to second-hand smoke.

As a result of these discussions with DHMAS and union officials, Mr. Perez convened a CVH-based steering committee in May 2007 to address smoking cessation as a central component of a five-part "Wellness Initiative" he hoped to launch in coordination with CVH's smoke-free policy. The record is clear that there was minimal resident participation in or CVH-led resident

discussions about the facility's decision to go smoke-free.

On July 20, 2007, Mr. Perez issued a memorandum to CVH staff and patients announcing that the facility would implement a smoke-free policy as of October 1, 2007, only approximately two months following the announcement. The resulting ban against smoking and tobacco products would make CVH an entirely smoke-free facility since the ban prohibited smoking and tobacco products anywhere on the CVH campus. Unlike the current CVH policy that prohibits smoking only indoors, the proposed smoking ban would expand that prohibition to smoking anywhere on campus grounds and would apply to staff, residents, and visitors alike. Mr. Perez's July 20, 2007 memorandum stated that the policy responded to "the deleterious health effects of tobacco smoking and second hand or environmental tobacco smoke" and aimed to counteract smoking's negative effects on "mental health treatment, the treatment milieu, overall wellness, and ultimately, recovery." *Id.* Ex. C at 2. The memorandum also stated that CVH would "provide adequate planning time and training for staff to implement new policies and procedures" and "ensure access to adequate and appropriate medical and psychosocial cessation treatment for consumers and staff alike." *Id.*

Also relevant to Plaintiffs' challenge is a Department of Justice ("DOJ") investigation of CVH, which was initiated on December 19, 2005 under the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997, and which focused on "the protection of patients from harm and the use of seclusion and restraints." Aff. of Thomas A. Kirk, Jr. [doc. # 95-3] Ex. A at 1. As part of its investigation, the DOJ conducted tours of CVH in May-June 2006 and interviewed a number of individuals, some of whom were residents. Both the DOJ's announcement of its investigation and its campus tours occurred prior to Mr. Perez assuming leadership responsibilities at CVH on August 22, 2006. Rather, the investigation occurred during the tenure of then-acting CEO Dr. Kenneth

Marcus. As a result of its investigation, the DOJ issued a letter and accompanying report (the "DOJ Report") to Connecticut Governor M. Jodi Rell on August 6, 2007. The letter and report indicated that the DOJ had found numerous conditions and practices at CVH that violated residents' constitutional and federal statutory rights. Both Mr. Perez and Dr. Kirk became aware of the content of the DOJ Report on August 6, 2007, the day it was released to the State. Among other claims, Plaintiffs allege that CVH officials banned smoking on campus in retaliation for patient cooperation with the DOJ investigation.

## II.

The summary judgment standard is a familiar one. Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the non-movant. *See Anderson*, 477 U.S. at 255; *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008). If the moving party carries its burden,

the party opposing summary judgment "may not rely merely on allegations or denials." Fed. R. Civ.

P. 56(e)(2). Rather, the opposing party must "set out specific facts showing a genuine issue for trial."

*Id.* In short, the nonmovant "must do more than simply show that there is some metaphysical doubt

as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment

may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

### III.

Plaintiffs allege that a complete ban against smoking and tobacco products violates a number

of federal and state rights. In particular, Plaintiffs assert a federal statutory violation under the

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and federal constitutional

claims under 42 U.S.C. § 1983 for equal protection and due process violations under the Fourteenth

Amendment, infringement of Plaintiffs' right to privacy under the penumbra of the United States

Constitution, and unlawful retaliation in violation of the First Amendment. Plaintiffs further allege

that the smoking ban violates provisions of Connecticut's Patient Bill of Rights, Conn. Gen. Stat. §

17a-540 *et seq.*, and the Connecticut Constitution. The Court will examine each of these arguments

in turn. However, the Court first addresses two preliminary matters.

First, Plaintiffs made clear at oral argument that they are primarily seeking equitable relief

against CVH and Defendants Kirk and Perez in their official capacities (with the possible exception

of their First Amendment retaliation claim for which they also seek damages). As to Plaintiffs'

claims under 42 U.S.C. § 1983, Plaintiffs cannot seek relief directly against CVH because it is a state

agency and not a "person" for purposes of Section 1983. *See Spencer v. Doe*, 139 F.3d 107, 111 (2d

Cir. 1998) (citing *Hafer v. Melo*, 502 U.S. 21, 26 (1991)). The Court therefore grants summary

judgment to CVH on Plaintiffs' Section 1983 claims. Thus, only Defendants Perez and Kirk remain as defendants to Plaintiffs' claims under Section 1983. Furthermore, because Plaintiffs are seeking only prospective injunctive relief against Defendants Kirk and Perez in their official capacities, the Court need not reach Defendants' arguments concerning qualified immunity. *See Kentucky v. Graham*, 473 U.S. 159, 159-67 (1985) (explaining the difference between personal and official capacity suits and the types of immunity available in each one); *State Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 84 (2d Cir. 2007) (same).

Second, Defendants object to Plaintiffs' assertion of an ADA violation for the first time in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Objection to Defendants' Motion for Summary Judgment [doc. # 102-2], because Plaintiffs never raised such a violation in any of their complaints – not the original complaint nor either of the two amended complaints. *See* Reply Brief in Supp. of CVH Defs.' Mot. for Summ. J. [doc. # 108] at 1-3; *see also* Compl. [doc. # 1]; Am. Compls. [docs. # 39, 40, 41]; Second Am. Compl. [doc. # 92]. At oral argument, the Court instructed Plaintiffs to examine the case law under the ADA to determine if they had a viable ADA claim, and if so, to move for leave to amend their Second Amended Complaint, addressing both cause for failure to seek to amend sooner and the prejudice to Defendants of such a late-filed amendment. The Court further directed Plaintiffs to attach the proposed amendment to any such motion so that the Court could better understand Plaintiffs' alleged ADA disability and the nature of their discrimination claim. To date, Plaintiffs have not moved to amend their complaint. The Court thus will not decide any issue related to a federal statutory violation under the ADA, because no such claim has ever been properly asserted in this case. Having addressed Plaintiffs' only federal statutory claim, the Court now examines each of Plaintiffs' federal constitutional claims.

## A.    Equal Protection

Plaintiffs contend that a complete ban on smoking and tobacco products violates their right to equal protection of the laws under the Fourteenth Amendment. Plaintiffs dedicate little attention to their equal protection argument in their Memorandum of Law in Support of Plaintiffs' Objection to Defendants' Motion for Summary Judgment [doc. # 102-2]. In their Motion for Summary Judgment [doc. # 95], Defendants treat Plaintiffs' equal protection claim as alleging unlawful state action on the basis of Plaintiffs' status as smokers. The Court attempted at oral argument to have Plaintiffs define what they deemed to be the relevant classification for purposes of showing unlawful discrimination under the Equal Protection Clause. Adopting an argument similar to that advanced in the *amicus* brief of the Connecticut Legal Rights Project, Plaintiffs responded that Defendants' unconstitutional action becomes clear when the Court compares the freedoms associated with an individual living in his own home to the restrictions faced by an individual civilly committed to CVH. As Plaintiffs argue, an individual at home can light up a cigarette whenever the individual wishes to do so, while those committed to CVH enjoy no similar freedom under the proposed smoking ban.

The Court rejects Plaintiffs' equal protection claim for several reasons. First, if the Court adopts Defendants' argument that the relevant classification is one's status as a smoker, CVH's action would be subject to rational basis review. This is so because "[s]moking, as a discretionary or volitional act, does not merit heightened scrutiny because [t]he Supreme Court has rejected the notion that a classification is suspect when entry into the class . . . is the product of voluntary action." *NYC C.L.A.S.H., Inc. v. City of New York*, 315 F. Supp. 2d 461, 482 (S.D.N.Y. 2004) (quotation marks omitted).

For example, in *NYC C.L.A.S.H.,* Plaintiffs challenged amendments to the New York State Clean Indoor Air Act and New York City Smoke Free Air Act, both of which severely curtailed smokers' ability to smoke indoors anywhere within New York City or New York State. *See id.* at 465-67. In rejecting the plaintiff's constitutional claims, the district court noted that the smoking bans did not violate the plaintiff's equal protection rights because "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 481 (quoting *FCC v. Beach Comm.*, 508 U.S. 307, 313 (1993)). The district court concluded that "[a]nti-smoking laws have never been recognized as creating a suspect or quasi-suspect classification" and further, that individuals "are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the State." *Id.* at 482 (quoting *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 62 (1872)).

As Defendants also point out, district courts outside of the Second Circuit have similarly rejected arguments that smoking bans require anything other than rational basis review. Thus, in *Thiel v. Nelson*, 422 F. Supp. 2d 1024 (W.D. Wisc. 2006), two patients involuntarily and indefinitely committed to a state-run mental health facility challenged the facility's *complete* smoking ban as violative of their due process and equal protection rights. The district court rejected the plaintiffs' arguments, reasoning that because smoking "is not a fundamental right and prisoners are not a suspect class," the State only had to show that the smoking ban was related to a legitimate government interest. *Id.* at 1030 (citing *Romer v. Evans*, 517 U.S. 620, 631 (1996)); *see also Brashear v. Simms*, 138 F. Supp. 2d 693, 694 (D. Md. 2001) (stating, in response to plaintiff's

challenge to a prison smoking ban, that "the act of smoking is entitled to only a minimal level of protection under the Equal Protection Clause, as it is obviously not a fundamental right, nor is the classification between smokers and non-smokers a suspect one"). *Thiel* also expressly rejected the argument that the complete ban violated the plaintiffs' equal protection rights because smoking was allowed at another in-state mental health facility. *See id.* In doing so, the court deferred to the state's authority, stating that "the decision whether to allow smoking at a state detention facility resides within the discretion of the officials charged with that facility." *Id.*

At oral argument, Defendants argued that the proposed smoking ban is reasonably related to legitimate state interests that include minimizing staff exposure to second-hand smoke, countering the negative side effects of smoking among CVH's residents, and reducing long-term health care costs associated with smoking. *See also* Aff. of Luis B. Perez [doc. # 95-2] Ex. A at 1 ("Seventy-five percent of individuals with either addictions or mental illness smoke cigarettes, compared with 22 percent of the general population. Nearly half of all cigarettes consumed in the United States are by individuals with a psychiatric disorder."); "No Ifs, Ands, or Butts," Pls.' Objection [doc. # 102-2] Ex. L (implementing the smoke-free policy on the basis of poor health outcomes and high incidents of smoking among persons with severe mental illness and/or substance abuse).

The Court agrees with Defendants. CVH's asserted interests are both legitimate and reasonably related to the proposed smoking ban, and therefore easily satisfy the requirements of the rational basis test. As the district court in *Thiel* pointed out, smoking bans such as that adopted at CVH further several interests, including "(1) improving the health and safety of inmates, for which the state is largely responsible; (2) reducing fire hazards; (3) maintaining clean and sanitary conditions; and (4) reducing complaints and the threat of litigation from inmates who do not smoke."

11

*Id.*; *see also Beatie v. City of New York*, 123 F.3d 707, 709 (2d Cir. 1997) ("Tobacco use has long been identified as a cause of death and disease in smokers, and in recent years medical researchers and public health officials have been persuaded that exposure to tobacco smoke may also place nonsmokers at risk."); *Brashear*, 138 F. Supp. 2d at 694 (reasoning that it should be "perfectly obvious to any rational person that the State . . . has a legitimate interest in protecting the health of non-smokers forced to be its guests in correctional facilities").

Second, the Court also believes that Plaintiffs' equal protection challenge fails even if the Court compares the rights and freedoms of the general citizenry with those facing long-term commitment at CVH. At oral argument, the Court pressed Plaintiffs on their position, and it became apparent that Plaintiffs' comparison is simply unsustainable. Plaintiffs' counsel acknowledged at oral argument that there are numerous differences between private individuals residing in their own homes and those committed to a state-run facility. Those important differences undermine Plaintiffs' comparison. As but one example, private citizens can drink alcohol in their own homes, but as Plaintiffs conceded, alcohol is properly prohibited on the CVH campus. In addition, unlike the general citizenry who might enjoy cigarettes on an outdoor deck, Plaintiffs must be escorted or supervised by CVH employees during outdoor smoking breaks. In sum, as the district court stated in *Lurz v. Adams*, "[w]hatever Plaintiffs state rights may be, they have no federal constitutional right to smoke while detained in government facilities." No. 08-3002, 2008 WL 435125, at * 1 (C.D. Ill. Feb. 14, 2008); *see id.* ("Similarly, whether Defendants should allow smoking on the patio or pod are decisions left to Defendants' discretion, not to a federal court.").

When reduced to its core, Plaintiffs' argument seems more appropriately viewed as alleged discrimination on the basis of a disability, one that causes a person to be committed to CVH.

However, even as so viewed, Plaintiffs' challenge remains subject only to rational basis review. *See Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 109 (2d Cir. 2001) (So long as rational basis review is satisfied, "no Fourteenth Amendment violation is presented even if the actions are done 'quite hardheadedly' or 'hardheartedly.'" (quoting *Bd. of Tr. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367-68 (2001))); *Story v. Green*, 978 F.2d 60, 63-64 (2d Cir. 1992) ("When a statute neither impinges upon a fundamental right guaranteed by the Constitution nor uses a classification based on a suspect criterion such as race, nationality, alienage, or gender, the law generally will not be found to violate the Equal Protection Clause unless it has no reasonable or rational basis. . . . We note in passing that most authorities have not considered disability to be a suspect or quasi-suspect classification.").

Because smoking is not a fundamental right, smokers are not a suspect class, and disability discrimination is not afforded intermediate or heightened scrutiny under the Constitution, Plaintiffs' equal protection challenge must be assessed under rational basis review. As the Court previously explained, Defendants' legitimate interests in protecting employees from exposure to second-hand smoke and the State's mental health patients from the negative health consequences of smoking are legitimate interests and they are reasonably related to the ban on smoking and tobacco products on the CVH campus. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' equal protection claim.

## B.     Procedural Due Process

At oral argument, Plaintiffs made clear that they also challenged Defendants' proposed ban on procedural due process grounds. According to Plaintiffs, Defendants deprived them of their liberty interest in choosing to smoke without due process. In determining whether a liberty interest

that triggers due process consideration exists, the Supreme Court has explained that "[a] liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *see also Rodriguez v. McLoughlin*, 214 F.3d 328, 338 (2d Cir. 2000) ("The most common manner in which a State creates a liberty interest is by establishing substantive predicates to govern official decisionmaking . . . and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." (quotation marks omitted)). "[W]here the claimed interest is rooted in state law, [the Court] looks to the particular state statute . . . that purports to establish the asserted entitlement in order to assess the parameters and strength of the alleged interest to determine if due process protection applies." *Sealed v. Sealed*, 332 F.3d 51, 56 (2d Cir. 2003).

Plaintiffs assert that the Connecticut Patient Bill of Rights, Conn. Gen. Stat. § 17a-540 *et seq.*, creates a protected liberty interest that triggers the requirements of procedural due process. *See Mahoney v. Lesnick*, 213 Conn. 548, 571 (1990) ("When a person has been institutionalized within a state mental health facility . . . the patient acquires, by virtue of his hospitalization, a constitutionally protected liberty interest under 42 U.S.C. § 1983 in these obligatory services.") (citation omitted); *see also Wiseman v. Armstrong*, 269 Conn. 802, 809 (2004) ("[B]ecause the patients' bill of rights is remedial in nature, its provisions should be liberally construed in favor of the class sought to be benefited.") (quoting *Mahoney*, 213 Conn. at 556). Plaintiffs take this position because the Patient Bill of Rights imposes certain substantive and procedural requirements on facilities like CVH that limits their discretionary authority and also because the legislation expressly refers to patients' "rights." *See, e.g.*, Conn. Gen. Stat. § 17a-541 (safeguarding psychiatric patients'

personal, property, and civil rights); § 17a-542 (guaranteeing psychiatric patients "humane and dignified treatment at all times, with full respect for [their] personal dignity and right to privacy"); § 17a-543 (requiring patients' written informed consent before being subjected to medication and medical or surgical procedures); § 17a-548 (listing patients' rights regarding clothing, possessions, money, and access to records). Plaintiffs contend that the current CVH policies on smoking, *see, e.g.*, Nicotine Product/Smoking Regulations dated 4/4/05, Pls.' Objection [doc. # 102-2] Ex. C at 1-2, as well as previous CVH policies that encouraged smoking, create a protected liberty interest in residents' ability to smoke. In particular, Plaintiffs argue that past and present CVH policies allowed smoking-related bartering, and linked smoking with increased outdoor privileges. *See* Pls.' Objection [doc. # 102-2] at 26; *see also* Aff. of Karen Kangas, *id.* Ex. E at 4, ¶ 21 ("In the recent past, an unwritten CVH policy was to reward [residents] with cigarettes for good behavior.").

Assuming – but not deciding – that Plaintiffs are correct that Connecticut's Patient Bill of Rights creates a liberty interest that protects Plaintiffs' right to choose to smoke at CVH, to make out a violation of procedural due process, Plaintiffs must still show that the protection afforded that interest is constitutionally inadequate. The determination of whether procedural protections are adequate is necessarily case-specific. The Supreme Court has made clear that "the requirements of due process are 'flexible and cal[l] for such procedural protections as the particular situation demands' . . . ." *See Wilkinson*, 545 U.S. at 224 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

In assessing the level of process that Plaintiffs are due, the Court considers the three factors enunciated in *Mathews v. Eldridge*, 424 U.S. 319 (1976):

First, the private interest that will be affected by the official action; second, the risk

of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335. Although *Mathews* is a balancing test, the second factor is outcome-determinative in this case because Plaintiffs are unable to identify either the risk of erroneous deprivation of their asserted liberty interest under current procedures or the additional or substitute procedures that should be imposed to better safeguard the asserted liberty interest. *Cf. Cruzan v. Dir., Missouri Dep't of Mental Health*, 497 U.S. 261, 294 (1990) (Scalia, J., concurring) ("The text of the Due Process Clause does not protect individuals against deprivations of liberty *simpliciter*. It protects them against deprivations of liberty 'without due process of law.'").

In fact, Plaintiffs concede that two procedures – a statutory remedy under the Connecticut Patient Bill of Rights and an internal CVH grievance process – afford them adequate protection against arbitrary denial of their rights. Under state law, "any person aggrieved by a violation of sections 17a-540 to 17a-549 inclusive, may petition the superior court within whose jurisdiction the person is or resides for appropriate relief, including temporary and permanent injunctions, or may bring a civil action for damages." Conn. Gen. Stat. § 17a-550. This statute makes clear that an individual can sue for equitable relief or damages if he believes his rights under the Connecticut Patient Bill of Rights have been violated. The Connecticut Patient Bill of Rights also sets forth the necessary standards for a facility's internal procedure regarding decisions to administer involuntary treatment. *See* Conn. Gen. Stat. § 17a-543. Further, CVH residents can file formal grievances if they believe the facility has violated a right protected by statute, regulation, or policy or that they have been denied services or treated in an arbitrary, unreasonable, inhumane, or undignified manner.

*See* Patients' Rights Handbook, Pls.' Objection [doc. # 102-2] Ex. D at 21-22, 40-41, 44-45. Thus, Plaintiffs have detailed procedures available to them by which they can seek to safeguard whatever rights they may have under Connecticut's Patient Bill of Rights.

Plaintiffs do not assert that the statutory remedy provided by the Patient Bill of Rights or the internal CVH grievance process are inadequate to protect their alleged liberty interest. Nor have Plaintiffs ever availed themselves of the rights provided by those processes. Furthermore, Plaintiffs have not identified any additional or substitute procedures that they believe would better protect their asserted rights. Therefore, even assuming – but not deciding – that the Connecticut Patient Bill of Rights creates a liberty interest in Plaintiffs' desire to continue to smoke on the CVH campus, the statute itself, as well as CVH's internal grievance process, provide Plaintiffs with all the process that the Fourteenth Amendment requires. Thus, Plaintiffs' procedural due process challenge fails.

### C.    Substantive Due Process

Plaintiffs' main federal claim is an alleged violation of substantive due process. "The Fourteenth Amendment 'forbids the government to infringe . . . "fundamental" liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). In support of their substantive due process claim, Plaintiffs rightly do not assert that smoking is a fundamental right or that they belong to a suspect class. *See Johnson v. Saffle*, No. 98-6225, 1998 WL 792071, at * 1 (10th Cir. Oct. 15, 1998) (dismissing as frivolous an inmate's due process challenge to a prison's "no smoking" policy); *Grass v. Sargent*, 903 F.3d 1206, 1206 (8th Cir. 1990) ("There is no constitutional right to smoke in prison."); *cf. Beatie*, 123 F.3d at 711("Legislative acts that do not interfere with fundamental rights or single out suspect

classifications carry with them a strong presumption of constitutionality and must be upheld if rationally related to a legitimate state interest. Accordingly, we will invalidate [New York's regulation of cigar smoking] on substantive due process grounds only when a plaintiff can demonstrate that there is no rational relationship between the legislation and a legitimate legislative purpose.").

Rather, Plaintiffs cleverly claim that Defendants' complete ban against smoking and tobacco products violates their fundamental right to refuse unwanted medical treatment and that the ban is not narrowly tailored to serve a compelling state interest. *See* Pls.' Objection [doc. # 102-2] at 21-24. Plaintiffs necessarily argue that the smoking ban constitutes a form of unwanted medical treatment, a position they state is supported by medical evidence demonstrating nicotine's effect on antipsychotic agents that are commonly used to treat psychosis and agitation and that are known as neuroleptics. *See generally id.* at 11-17. Plaintiffs, all of whom take these medications, claim that the smoking ban will deprive them of nicotine and thereby alter how their neuroleptic medications function, thus requiring adjustments to their medication dosages that they do not want. This, they say, is unconstitutional.

Plaintiffs invoke *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990), in support of their argument. In *Cruzan*, the Supreme Court considered whether the petitioners, a female in a persistent vegetative state and her parent-guardians, had asserted a constitutionally-protected right to refuse life-sustaining medical treatment. *Id.* at 269. In reviewing their claim of a protected liberty interest in refusing unwanted medical treatment, the Supreme Court traced the history of the concept of bodily integrity and informed consent and concluded that the "logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to

consent, that is to refuse treatment." *Id.* at 270. The Supreme Court stated that the "principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions." *Id.* at 278; *see Glucksberg*, 521 U.S. at 720. However, *Cruzan* made clear that identifying a constitutionally-protected liberty interest does not end the inquiry; rather, "whether [an individual's] constitutional rights have been violated must be determined by balancing [the individual's] liberty interests against the relevant state interests." *Cruzan*, 497 U.S. at 279 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)). In her concurrence in *Cruzan*, Justice O'Connor clarified the underlying rationale of recognizing a protected liberty interest in refusing unwanted medical treatment:

> [T]he liberty interest in refusing medical treatment flows from decisions involving the State's invasions into the body. . . . Because our notions of liberty are inextricably entwined with our ideal of physical freedom and self-determination, the Court has often deemed state incursions into the body repugnant to the interest protected by the Due Process Clause. . . . Our Fourth Amendment jurisprudence has echoed this same concern. . . . The State's imposition of medical treatment on an unwilling competent adult necessarily involves some form of restraint and intrusion. . . . Such forced treatment may burden that individual's liberty interests as much as any state coercion.

*Id.* at 287-88 (citations omitted).[3]

The Supreme Court again grappled with health-related liberty interests in *Washington v. Glucksberg*, 521 U.S. 702 (1997), the case in which the Court refused to recognize a fundamental right to physician-assisted suicide. In *Glucksberg*, the Court noted the consequence of broadly-defined liberty interests: "By extending constitutional protection to an asserted right or liberty

---

[3] The Second Circuit has relied on *Cruzan* in recognizing a protected liberty interest in refusing unwanted medical treatment, *see Green v. City of New York*, 465 F.3d 65, 84-85 (2d Cir. 2006). It has further held that such a protected liberty interest "carries with it a concomitant right to such information as a reasonable patient would deem necessary to make an informed decision regarding medical treatment." *Pabon v. Wright*, 459 F.3d 241, 246 (2d Cir. 2006).

interest, [the Supreme Court], to a great extent, place[s] the matter outside the arena of public debate and legislative action." *Id.* at 720; *see also Chavez v. Martinez*, 538 U.S. 760, 755 (2003) ("[W]e have expressed our reluctance to expand the doctrine of substantive due process, in large part because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.").  With this in mind, the Court noted that its substantive due process analysis consists of two main features:  (1) determining whether the fundamental right or liberty interest is deeply rooted in history and tradition; and (2) requiring "a 'careful description' of the asserted fundamental liberty interest." *Id.* at 720-21; *see also Chavez*, 538 U.S. at 775-76 (reaffirming *Glucksberg*'s requirement of a careful description of the asserted fundamental liberty interest); *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 359-61 (2d Cir. 2004) (discussing *Cruzan* and *Glucksberg*); *Jennis v. Rood*, 488 F. Supp. 2d 172, 185-87 (N.D.N.Y. 2007) (invoking *Glucksberg* and *Chavez* to deny plaintiff's due process claim).

*Glucksberg* thus requires a careful, or precise, description of the liberty interest alleged.  For example, the Supreme Court in *Glucksberg* explained that *Cruzan* was about a "constitutionally protected right to refuse lifesaving hydration and nutrition," and that *Glucksberg* involved "a right to commit suicide which itself includes a right to assistance in doing so." *Id.* at 722-23.  The Court clarified that *Cruzan* was not borne out of "abstract concepts of personal autonomy," but rather "the common-law rule that forced medication was a battery, and the long legal tradition protecting the decision to refuse unwanted medical treatment." *Id.* at 725.  In *Glucksberg*, the Supreme Court refused to recognize a broad application of "self-sovereignty," and in doing so, rejected the assertion that either *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992), or *Cruzan* supported a right to affirmatively hasten death via (physician-assisted) suicide. *See id.* at 725-26,

728; *Estate of Pouliot*, 356 F.3d at 359 (noting that *Glucksberg* carefully "cabined" the right recognized in *Cruzan,* thereby rejecting the conclusion that it "reflect[ed] a general tradition of self-sovereignty"). *Glucksberg* thus makes clear that not all decisions that relate to health implicate a constitutionally-protected liberty interest. *Id.* at 727-28 ("That many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected, . . . and *Casey* did not suggest otherwise."); *see Estate of Pouliot*, 356 F.3d at 360 ("[T]he personal autonomy rationale employed here does not create new substantive rights entitled to protection under the Due Process clause.").

*Glucksberg*'s requirement of a "careful description" of the asserted liberty interest is significant in this case. Here, Plaintiffs urge a broad reading of *Cruzan* and *Glucksberg* that would accord constitutional protection to their desire to be free from Defendants' smoking ban because of the ban's potential effect on their antipsychotic medications. In support of their position, Plaintiffs cite medical evidence regarding the failure of neuroleptic agents to counter the negative symptoms of mental illness that generally include apathy, social isolation, withdrawal, and lack of motivation. *See* Diabetes, Psychiatric Disorders, and the Metabolic Effects of Antipsychotic Medications, Pls.' Objection [doc. # 102-2] Ex. R at 18-19 (explaining the failure of first- and second-generation antipsychotics to counter negative symptoms); Consensus Development Conference on Antipsychotic Drugs and Obesity and Diabetes, *id.* Ex. T at 596 (same). In addition, they cite the report of their expert, Dr. Mehmet Sofuoglu, that reviews cigarette smoking in the mentally ill and discusses nicotine's counteractive effect on both the negative symptoms of mental illness and the negative side effects of neuroleptic medications. *See generally* Mehmet Sofuoglu, M.D., Ph.D.,

Opinion on Smoking Ban in Psychiatric Inpatient Facilities, *id.* Ex. W.

Dr. Sofuoglu reports that "smokers with mental illness experience more severe withdrawal symptoms when they abstain from smoking. These symptoms include depression, irritability, restlessness, difficulty sleeping, anxiety/nervousness, increased appetite and poor concentration." *Id.* at 1. For schizophrenic smokers, smoking "improves cognitive performance, which may help patients think and concentrate better . . . [and] may alleviate some of the adverse effects from antipsychotic medications including sedation, mental slowness and muscle stiffness." *Id.* For depressed patients, smoking may "improve[] mood." *Id.* Finally, Dr. Sofuoglu reports on studies that "suggest that mentally ill smokers may require longer and more intense treatment, including combination of medications for smoking cessation." *Id.* at 2. This need for a longer and more intensive smoking cessation program may be especially true for smokers like Plaintiffs because "blood levels of antipsychotics can be up to 50 percent lower in heavy smokers. As a result, smokers generally require higher doses of antipsychotics. When these patients stop smoking, plasma levels of these medication[s] increase significantly, which may result in dangerous side effects." *Id.*

Plaintiffs also attest to the effects of smoking that are described in Dr. Sofuoglu's report. *See, e.g.*, Aff. of Bryan Giordano, *id.* Ex. H at 4, ¶ 21; Aff. of Jeannette Elliott, *id.* Ex. I at 2, ¶ 17. However, whatever effects smoking may have for Plaintiffs, there is no suggestion that smoking is a form of medical treatment for mental illness. *Cf. id.* Ex. W at 3 ("Smoking policies in psychiatric facilities should reflect the special needs of mentally ill smokers. Forced cigarette abstinence is not a treatment for cigarette smoking in mentally ill smokers. Psychiatric facilities need to develop well-planned, well-coordinated and science-based, smoking policies focusing on the long-term benefits of the mentally ill smokers."). As Dr. Kenneth Marcus explained in his deposition: "[Y]ou wouldn't

tell somebody to smoke to control their depression or schizophrenia?  A: Exactly, right.  Q: It wouldn't be prescribed?  A: Right." *Id.* Ex. B at 20.

Plaintiffs acknowledge that Defendants plan to make nicotine replacement therapy available for both staff and resident smokers and importantly, that such therapy is not mandatory.  Thus, unlike the cases chronicled in *Cruzan*, there is no aspect of Defendants' smoking ban that will result in any physical intrusion upon or bodily invasion of Plaintiffs.  *Cf. Cruzan*, 497 U.S. at 269-73, 275-79; *Glucksberg*, 521 U.S. at 724-25; *Estate of Pouliot*, 356 F.3d at 360 (noting that the right suggested in *Cruzan* was founded upon "well-established, traditional rights to bodily integrity and freedom from unwanted touching." (quotation marks omitted)).  A "careful description" of Plaintiffs' asserted liberty interest does not support their assertion that it involves the right to refuse forced medical treatment.  Rather, the more precisely-defined liberty interest that Plaintiffs seek to protect might be thought of as the "right to refuse a smoking ban," or perhaps the "right to smoke," neither of which, Plaintiffs acknowledge, are fundamental rights.  *Cf. Beatie*, 123 F.3d at 711.  *See also Chavez*, 538 U.S. at 776 ("[V]ague generalities, such as 'the right not to be talked to,' will not suffice.").

The Court understands that some patients in consultation with their physicians may require adjustments in their medications once they no longer have access to nicotine via cigarettes.  But the Court cannot transform that fact into the equivalent of a forced medical procedure that might implicate a constitutionally-protected liberty interest.  *See Glucksberg*, 521 U.S. at 720 ("[W]e have always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." (citation and quotation marks omitted)); *Chavez*, 538 U.S. at 776.  In sum, the Court is unconvinced that CVH's ban on smoking is the same as forced medical treatment, even for this patient population.

Because Plaintiffs have not demonstrated that the smoking ban implicates their right to refuse unwanted medical treatment, to succeed on their substantive due process claim they bear the heavy burden of demonstrating that Defendants' proposed action is not rationally related to a legitimate state interest. *See Glucksberg*, 521 U.S. at 728; *Beatie*, 123 F.3d at 711 ("Legislative acts that do not interfere with fundamental rights or single out suspect classifications carry with them a strong presumption of constitutionality and must be upheld if 'rationally related to a legitimate state interest.'" (quoting *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985))). In order to meet this burden, Plaintiffs must "discredit any conceivable basis which could be advanced to support the challenged provision, regardless of whether that basis has foundation in the record, . . . or actually motivated [Defendants]." *Beatie*, 123 F.3d at 713. As the Court has previously explained, Defendants have legitimate interests in minimizing staff and resident exposure to second-hand smoke, protecting residents from the deleterious health effects of smoking, and reducing long-term health care costs associated with smoking. *See* Part III.A *supra*.

Plaintiffs have not demonstrated that it is irrational to implement a smoking ban in order to achieve these interests. Thus, Plaintiffs' substantive due process challenge fails. However, Plaintiffs have shown that implementing such a ban at a mental health facility requires careful planning and time. Therefore, the Court certainly hopes that CVH will take Dr. Sofuoglu's findings into account in deciding whether, how, and when to lift the moratorium on the smoking ban.

### D.    Privacy

Plaintiffs further allege that a complete ban against smoking and tobacco products at CVH violates their fundamental right to privacy and autonomy under the penumbra of the United States Constitution. As to this constitutional challenge, Plaintiffs claim that an individual's right to privacy

and autonomy encompasses the decision to smoke and that this choice, though potentially subject to some form of regulation, cannot be banned completely.

In essence, Plaintiffs argue that a smoking ban at CVH violates their "right to be let alone." However, the Supreme Court has made clear that simply because "many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected." *Glucksberg*, 521 U.S. at 727-28. Plaintiffs have not demonstrated that the right to privacy encompasses a right to smoke, a task made that much more difficult because the Second Circuit has rejected the notion that smoking is a fundamental right deserving of heightened scrutiny. *Accord Beatie*, 123 F.3d at 712. Plaintiffs' privacy argument similarly fails if it is based on a generalized right to make important decisions related to their medical treatment. As the Second Circuit has explained, however, "the Supreme Court has made clear that claims concerning unwanted medical treatments are properly analyzed 'in terms of a Fourteenth Amendment liberty interest,' rather than in terms of a privacy interest.'" *Estate of Pouliot*, 356 F.3d at 361 (quoting *Cruzan*, 497 U.S. at 279 n.7).

Plaintiffs may well find stronger support for their asserted right to privacy under state law, particularly the Patient Bill of Rights. But they have not shown that Defendants' proposed ban violates the federal constitution. Thus, Plaintiffs' federal privacy argument also fails.

### E.     Unlawful Retaliation

Last, Plaintiffs argue that Defendants' decision to implement a complete ban against smoking and tobacco products was formulated in retaliation for CVH residents' participation in the DOJ's investigation into CVH conditions and practices and in response to the DOJ Report, all in violation

of Plaintiffs' First Amendment rights. Defendants respond that Plaintiffs' retaliation claim is wholly conclusory, unsupported by any factual evidence, and contradictory to the relevant sequence of events since Defendants learned of the DOJ Report on August 6, 2007, almost two weeks *after* the decision to go smoke-free was announced on July 20, 2007.

To state a claim for unlawful retaliation under the First Amendment, Plaintiffs must demonstrate by a preponderance of the evidence that "(1) the expression at issue was constitutionally protected, (2) the alleged retaliatory action adversely affected [Plaintiffs'] constitutionally protected expression, and (3) a causal relationship existed between the constitutionally protected expression and the retaliatory action." *Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003); *see also Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001); *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998). Defendants argue that Plaintiffs' First Amendment retaliation challenge fails on multiple levels. The Court agrees.

First of all, Plaintiffs have failed to demonstrate that they participated in the DOJ investigation and therefore engaged in any constitutionally-protected speech or activity. Defendants properly note that not one of the Plaintiffs has alleged that he spoke to DOJ officials or participated in the DOJ investigation at all. Further, nothing in the affidavits of two of the named Plaintiffs even makes reference to the DOJ investigation. *See* Aff. of Bryan Giordano, Pls.' Objection [doc. # 102-2] Ex. H; Aff. of Jeannette Elliott, *id.* Ex. I. Also, Plaintiffs' only citation to the record concerning the substance of the DOJ tours and investigation is a quote from the DOJ Report: "In conducting our on-site investigation, we interviewed administrators, staff, and patients, and examined the physical conditions at the facility." *See* Pls.' Objection [doc. # 102-2] at 33.

Plaintiffs' counsel conceded at oral argument that Plaintiffs' mental disabilities made it

difficult to ascertain whether any of the Plaintiffs had spoken with DOJ officials during its 2006 tour of the CVH campus. However, Plaintiffs take the position that even if they cannot show that they personally engaged in constitutionally protected speech, they have third-party standing to assert their co-residents' First Amendment claims. *See Camacho*, 317 F.3d at 159 ("A plaintiff may assert the constitutional claims of a third party if the plaintiff can demonstrate: (1) injury to the plaintiff, (2) a close relationship between the plaintiff and the third party that would cause plaintiff to be an effective advocate for the third party's rights, and (3) 'some hindrance to the third party's ability to protect his or her own interests.'" (quoting *Campbell v. Louisiana*, 523 U.S. 392, 397 (1998))). Assuming – without deciding – that Plaintiffs do have standing to assert a First Amendment retaliation claim based upon constitutionally-protected activity by other residents of CVH, Plaintiffs nonetheless face other insurmountable obstacles in demonstrating a causal connection between any resident participation in the DOJ investigation and Defendants' implementation of a complete smoking ban. This is especially so because DOJ officials presumably spoke to both smokers and non-smokers during the course of their investigation.

Plaintiffs make two main arguments in support of a causal relationship between the DOJ investigation and Defendants' proposed smoking ban. First, Plaintiffs rely on the temporal nexus between the announcement of the proposed smoking ban and the release of the DOJ Report. It is true that the two events occurred close in time, but the temporal relationship is contrary to most retaliation claims in that the event that allegedly motivated Defendants' retaliatory action – namely, the release of the DOJ Report on August 6, 2007 – occurred *after* the alleged retaliatory action – namely, the announcement of the complete smoking ban on July 20, 2007.

Plaintiffs also argue that their position is bolstered by the fact that there were far more

important aspects to the DOJ Report, such as the need for CVH to develop more coherent treatment plans, that should have taken precedence over implementation of a smoking ban. *See* Dep. of Kenneth Marcus, M.D., Pls.' Objection [doc. # 102-2] Ex. B at 49-50. In support, Plaintiffs rely heavily on the deposition testimony of former CVH Acting CEO Dr. Marcus. Dr. Marcus is not a supporter of a complete ban on smoking at CVH. *See id.* at 26, 39-40 ("The essence of the argument is that long-term residents of psychiatric facilities should not be treated differently on a group basis than anyone else with regard to smoking cessation policies. . . . I was opposed to a ban as a class as opposed to as we often do, there are some people who are forbidden for specific reasons, [on an] individualized basis, but not as a group."). Nevertheless, Dr. Marcus made it clear that there was "zero" connection between the DOJ investigation and the smoking ban; rather, he stated the timing of the ban "reflected a national movement." *Id.* at 51-52.

In response to Plaintiffs' deposition questions, Dr. Marcus stated that the ban "had nothing to do with the Department of Justice. And I say that being on the, as you can see, on the other side of this. That part of the allegation[s] are outrageous. . . . I don't think from [Plaintiffs' counsel's] perspective you could have any idea of the power of the national movement in relation to this. And if you had a sense of that, retaliation wouldn't be an issue. There's a groundswell, a national groundswell." *Id.* at 52-53; *see also id.* at 36 ("This has been an issue for about three years in the National Association of State Mental Health Programs Directors in the medical council."); Smoking Bans in Long-Term Psychiatric Settings, *id.* Ex. V (setting forth Dr. Marcus's thoughts against smoke-free initiatives for the institutionalized).

Second, Plaintiffs assert that Defendants' failure to pursue the remaining aspects of the "Wellness Initiative" during the pendency of these proceedings supports the conclusion that the

"initiative was simply a way to cloak the smoking ban."  Pls.' Objection [doc. # 102] at 8-9.

However, Mr. Perez's deposition testimony refutes Plaintiffs' supposition.  Mr. Perez stated that

CVH operates under a "biopsychosocial model" and that he did not think it would be possible to

implement one area of the "Wellness Initiative" without implementing the other four areas as well.

Thus, under Mr. Perez's approach, the "Wellness Initiative" would not be effective in the absence

of the smoking ban.  In addition, the July 2007 memorandum to CVH staff and residents makes clear

that "[b]ased on the recommendations of the Steering Committee members and its sub-groups, the

first initiative to be undertaken is for [CVH] to go smoke free."  Aff. of Luis B. Perez [doc. # 95-2]

Ex. C at 2.  Whether Defendants should have pursued the other initiatives – nutrition, oral hygiene,

general health, and exercise, body, and mind – in the absence of the smoking ban is not a question

for this Court.  But CVH's failure to do so says nothing at all about whether there is a causal

relationship between adoption of the smoking ban and the DOJ investigation or Report.

Finally, Plaintiffs admit that CVH participated in a nationwide smoke-free initiative among

psychiatric hospitals, that Defendants lacked knowledge about the basis of the DOJ investigation,

and that Mr. Perez did not assume his post at CVH until after the DOJ investigation commenced and

its campus tours of CVH were complete.  *See* Pls.' Local Rule 56(a)(2) Response [doc. # 102-1] at

1.  In addition, the record also demonstrates that the employees' union had advocated for a smoke-

free campus as early as 2006, and that Mr. Perez had organized a steering committee and working

subgroups in spring 2007 to address the potential smoking ban.[4]  On the basis of Plaintiffs'

---

[4]  Dr. Kirk has also submitted written testimony in support of a Connecticut House Bill that would
"enable the Tobacco and Health Trust Fund Board to allocate additional funds for effective smoking
prevention and cessation programs . . . ."  *See* Memorandum from Thomas A. Kirk, Jr., Ph.D.,
Commissioner, to Appropriations Committee dated March 12, 2008, Pls.' Objection [doc. # 102-2]
Ex. N.

admissions and the record before the Court, no reasonable jury could conclude that Defendants' proposed smoking ban was implemented in retaliation for resident participation in the DOJ investigation. The record is clear that the DOJ investigation and CVH's consideration of the smoking ban were proceeded independently and that the smoking ban was announced before the content of the DOJ Report became known to CVH administrators. Because Plaintiffs have failed to establish a causal relationship between the two events, Defendants are entitled to judgment on their First Amendment retaliation claim.

### F.    State Law Claims

Finally, Plaintiffs argue that the complete ban on smoking and tobacco products violates the Connecticut Patient Bill of Rights, Conn. Gen. Stat. § 17a-540 *et seq.* In addition, Plaintiffs contend that CVH's decision to ban smoking on its campus, which includes public roads, violates Connecticut's "separation of powers principles" because CVH exceeded its statutory grant of authority in applying the ban to public streets that cross through the CVH campus. Finally, Plaintiffs also allege violations of Article One, Section One of the Connecticut Constitution.

The Court declines to exercise supplemental jurisdiction over Plaintiffs' state claims. *See* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if – (1) the claim raises a novel or complex issue of State law, . . . [or], (3) the district court has dismissed all claims over which it has original jurisdiction . . . ."). As this Court has previously stated, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." *Hernandez v. Carbone*, 567 F. Supp. 2d 320, 333-34 (D. Conn. 2008)

(quoting *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003)). The Second Circuit has made clear that "a district court particularly abuses its discretion when it retains jurisdiction over state-law claims raising unsettled questions of law following dismissal of all original-jurisdiction claims." *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 124 (2d Cir. 2006). Because this Court has dismissed all of Plaintiffs' federal constitutional claims and because Plaintiffs' state claims raise novel issues of law, it would be improper for this Court to maintain jurisdiction only to decide those issues.

The Court hastens to add, however, that nothing in this Court's decision should be construed as indicating the Court's view about the strength, or lack of strength, of Plaintiffs' state law claims. That is a matter entirely for the state courts to decide. *See Project Release v. Prevost*, 722 F.2d 960, 979 (2d Cir. 1983) ("[T]he substantive rights provided by the Federal Constitution define only a minimum [and] State law may recognize liberty interests more extensive than those independently protected by the Federal Constitution." (quoting *Mills v. Rogers*, 457 U.S. 299, 300 (1982))).

### III.

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment [doc. # 95] insofar as Plaintiffs' federal constitutional claims are concerned. As to Plaintiffs' state law claims, the Court declines to exercise supplemental jurisdiction over those claims. Plaintiffs' state law claims are, therefore, dismissed without prejudice. Plaintiffs may re-file their claims in state court.

IT IS SO ORDERED.

/s/        Mark R. Kravitz
United States District Judge

**Dated at New Haven, Connecticut: December 3, 2008.**